

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
UNITED STATES OF AMERICA,   :
             :
    v.          :  **MEMORANDUM AND ORDER**
             :  20-CR-51 (WFK)
NANCY JEAN,       :
             :
             :
      Defendant.  :
-------------------------------------------------------------X

**WILLIAM F. KUNTZ, II, United States District Judge:**

On December 8, 2021, Nancy Jean ("Defendant") pled guilty to the sole count of an Indictment charging her with Wire Fraud Conspiracy, in violation of 18 U.S.C §§ 1343 and 1349. The Court now sentences Defendant and provides a complete statement of reasons pursuant to 18 U.S.C. § 3553(c)(2) of those factors set forth by Congress in 18 U.S.C. § 3553(a). For the reasons discussed below, Defendant is hereby sentenced to 15 months of imprisonment, 2 year(s) of supervised release with special conditions, restitution, forfeiture in accordance with the Amended Order of Forfeiture, and a $100.00 mandatory special assessment.

**INTRODUCTION**

On January 8, 2020, agents with the Federal Bureau of Investigation ("FBI") arrested Nancy Jean ("Defendant") at John F. Kennedy International Airport in the Eastern District of New York pursuant to an arrest warrant issued by the Honorable Magistrate Judge Sanket Bulsara the day prior. Presentence Investigation Report ("PSR"), ECF No. 46, at ¶ 18; *see* ECF No. 2. On January 9, 2020, Magistrate Judge Bulsara arraigned Defendant on the Complaint and ordered her released on a $75,000.00 bond with two sureties. ECF No. 6.

On February 5, 2020, a grand jury returned a single-count Indictment charging Defendant and co-Defendant Carissa Scott ("co-Defendant" or "co-Defendant Scott") with Wire Fraud Conspiracy contrary to 18 U.S.C § 1343, in violation of 18 U.S.C § 1349. ECF No. 15. On February 14, 2020, the Honorable Magistrate Judge Lois Bloom arraigned Defendant on the Indictment, at which time Defendant pled not guilty. ECF No. 21. On December 8, 2021,

1

Defendant changed her plea to guilty pursuant to a plea agreement before the Honorable Magistrate Judge Roanne L. Mann. ECF No. 43.

On October 12, 2022, this case was reassigned from the Honorable Judge Sterling Johnson to this Court, over which the Honorable Judge William, F. Kuntz, II presides. On October 31, 2022, this Court accepted Defendant's guilty plea. ECF No. 64.

This Court hereby sentences Defendant and sets forth its reasons for Defendant's sentence using the rubric of the 18 U.S.C. § 3553(a) factors pursuant to 18 U.S.C. § 3553(c)(2).

## DISCUSSION

### I. Background

Prior to their arrests, Defendant and co-Defendant Scott worked with Canvas Media Group ("Canvas"), an Atlanta-based company responsible for booking musical acts for concerts and events. *See* PSR ¶ 4. The PSR reports that Defendant owned and operated Canvas, *id.* ¶ 56, and the PSR as amended notes that Defendant was Canvas's founder and sole employee. PSR Addendum at 2, ECF No. 120 ("PSR Addendum" or "The Addendum"); *see also* Def. Mem. at 2, ECF No. 116; Gov't Mem. at 4, ECF No. 119. While working with Canvas, Defendant served in numerous roles, including as a music promoter, booking agent, and road manager. PSR ¶¶ 4, 56.

The instant offense arises from a scheme Defendant and co-Defendant executed while working with Canvas. Defendants had devised a plan to defraud investors in a Sandy Hook Benefit Concert ("Benefit Concert"), which was designed to raise funds for the Sandy Hook Promise Foundation ("the Foundation") and create profits for investors. *Id.* ¶¶ 5, 6. Families of Sandy Hook Elementary School shooting victims founded the Foundation as a charitable

organization to provide programs and practices to better protect children from gun violence. *Id.* ¶ 6 n.1.

Specifically, an individual associated with the Foundation ("Individual #1") worked with Canvas to help organize a concert to raise funds for the Foundation and create profits for the investors. *Id.* ¶ 6. As part of their scheme, Defendant and co-Defendant Scott falsely claimed to act as booking agents for several famous musicians and suggested they could secure top-tier musical acts to perform at the Benefit Concert. *Id.* ¶¶ 5-6. However, the PSR states that Defendants were neither affiliated with those musicians nor had they spoken with any representative for said musicians. *Id.* ¶¶ 5-6. Defense counsel objects to this portion of the PSR, representing that Defendant in fact spoke with individuals in the music industry and representatives affiliated with the artists, who then worked to advance performance agreements with those artists. Def. Mem. at 2. Indeed, defense counsel dedicates numerous pages of its sentencing memorandum to outlining Defendant's attempts to book these musical acts. Def. Mem. at 6-12. The Government objects to Defendant's proposed amendment to the PSR, noting that "[t]he FBI interviewed the agents for Justin Timberlake and Bruno Mars, both of whom advised that they would be aware of any legitimate bookings or negotiations for concerts or appearances, and none of them had any knowledge of [co-Defendant] Scott, [Defendant] Jean, their company, or the concert at issue." Gov't Mem. at 5. Probation made no amendments to the PSR in light of these objections. PSR Addendum at 2-3.

In furtherance of the conspiracy, on several different occasions, co-Defendant Scott spoke with Individual #1 via telephone, text, and email. PSR ¶¶ 6-9. She did so to inform him she was making arrangements and preparing contracts for various celebrity musicians to perform at the Benefit Concert. *Id.* ¶¶ 7-9. Co-Defendant Scott also included payment-related

information in her messages to Individual #1.  *Id.* ¶¶ 8-9.  Namely, she instructed Individual #1 on how to pay for the performers and secure their performances through deposits payable by wire.  *Id.*  Co-Defendant Scott also substantiated these payment requests by including in her messages contractual agreements with potential musical performers, including the terms and conditions—and the fees—of the performers expected to perform at the Benefit Concert.  *Id.* ¶¶ 8-10.  On two such occasions, on October 22, 2019 and October 31, 2019, co-Defendant Scott forwarded Individual #1 an email from Defendant which included a purported contract with the musician Justin Timberlake.  *Id.* ¶ 8.  Defendant and co-Defendant relayed this contract to induce Individual #1 to arrange to have a fellow Concert investor send a wire transfer in the amount of $100,000.00 to a Wells Fargo account jointly held in Canvas Media and Defendant's names ("Wells Fargo Account") as a partial deposit for Mr. Timberlake's performance.  *Id.* at ¶¶ 8-9.  The Wells Fargo Account received an incoming transfer of $100,000.00 from Individual #1 on October 31, 2019.  *Id.* ¶ 15.

Furthermore, on November 12, 2019, after Individual #1 became suspicious, Defendant and her co-Defendant used a MagicJack—an Internet-based telephone service provider—account registered to Defendant and Canvas to have another individual call Individual #1 while pretending to be Mr. Timberlake's manager to assure him Mr. Timberlake intended to perform at the concert but required additional payments.  PSR ¶¶ 11-12; Gov't Sent. Mem. at 3-4.  Specifically, the individual noted that the original contract price was insufficient and that Mr. Timberlake's fee would need to be increased to between $800,000.00 and $1 million.  PSR ¶ 11.

An undercover FBI agent was introduced to Defendant and co-Defendant Scott as a potential investor in the Benefit Concert following Defendant's November 12, 2019 call.  *Id.* ¶ 13.  During a recorded conversation with the undercover agent and Defendant, co-Defendant

Scott reiterated Mr. Timberlake's and other premier musical performers' alleged concerns with the terms of their respective contracts and payment plans. *Id.* The undercover agent also asked Defendant and co-Defendant Scott whether the deposit money used to secure the artists' performances was segregated and used just for the artist, which co-Defendant Scott confirmed. *Id.* The undercover agent also asked whether any money sent towards the deposit should be sent to Defendant's account, which both Defendant and co-Defendant Scott confirmed that it should be. *Id.*

A subsequent conversation between the undercover FBI agent, Defendant, and co-Defendant Scott occurred on December 3, 2019. *Id.* ¶ 14. Purportedly to ensure certain performers' performances at the Benefit Concert, Defendant told the undercover agent that they would need an up-front deposit for whichever artist they were moving forward with, which co-Defendant Scott clarified meant the *full* deposit. *Id.* (emphasis added). Additionally, when asked on the call how they derive profit from their work, co-Defendant Scott noted that they make money on the back end and charge a ten percent booking fee. *Id.*

A review of the Wells Fargo Account confirmed an October 31, 2019 incoming transfer of $100,000.00 from Individual #1. *Id.* ¶ 15. The PSR states that the records do not reflect any outgoing payments to Mr. Timberlake, Mr. Mars, their respective agents and management companies, or any party known to be associated with them. *Id.* Instead, the PSR reports the following transactions in the 30 days following the deposit: one payment of approximately $4,000.00 to Mercedes-Benz; cash withdrawals amounting to more than $8,700.00; one payment of approximately $6,000.00 sent via Cash App, a mobile payment service, to an individual identified as "Carissa"; and one payment of approximately $1,203.00 to a Saks Fifth Avenue store. *Id.* Defense counsel notes two objections to this portion of the PSR. First, defense

counsel asserts that Defendant made Cash App payments to an individual associated with Mr. Timberlake's manager and producer. Def. Mem. at 2. The Government objects to this proposed amendment to the PSR on the grounds that Defendant "supplies no competent evidence to support [the individual's] claimed 'association' with Timberlake's manager or producer." Gov't Mem. at 5. Second, and without objection from the Government, defense counsel notes that the PSR excludes the fact that the Mercedes-Benz was returned and refunded. Def. Mem. at 2; Gov't Mem. at 5. The PSR as amended reflects that the Mercedes-Benz was returned. PSR Addendum at 3.

## II.    Legal Standard

18 U.S.C. § 3553 outlines the procedures for imposing a sentence in a criminal case. A sentencing court must also consider the Sentencing Guidelines in addition to the seven factors listed in 18 U.S.C. § 3553(a) when making a sentencing decision. The Court has done so in this case.

The Sentencing Guidelines are merely advisory in light of the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220, 264 (2005). Nevertheless, the Guidelines range is the "starting point and the initial benchmark[]" for a court evaluating a criminal sentence. *Gall v. United States*, 552 U.S. 38, 49 (2007). "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Id.* at 49. In this regard, the Guidelines provide "the framework for sentencing and anchor . . . the district court's discretion." *Molina-Martinez v. United States*, 578 U.S. 189, 198-99 (2016) (internal reference and quotation marks omitted).

If and when a district court imposes a sentence outside of the Sentencing Guidelines range, the court "shall state in open court the reasons for its imposition of the particular sentence, and . . .the specific reason for the imposition of a sentence different from that described" in the Guidelines. 18 U.S.C. § 3553(c)(2). The court must also "state[] with specificity" its reasons for so departing or varying "in a statement of reasons form." *Id.* "The sentencing court's written statement of reasons shall be a simple, fact-specific statement explaining why the guidelines range did not account for a specific factor or factors under § 3553(a)." *United States v. Davis*, 08-CR-0332, 2010 WL 1221709, at *1 (E.D.N.Y. Mar. 29, 2010) (Weinstein, J.) (internal reference and quotation marks omitted).

This Court has considered the applicable Guidelines range as well as the seven factors listed in Section 3553(a). It addresses each in turn consistent with *United States v. Crosby*, 397 F.3d 103, 112 (2d Cir. 2005).

## III.    Analysis

### A.    The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

The first § 3553(a) factor requires the Court to evaluate "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1).

#### 1.    Family and Personal Background

Defendant was born in Brooklyn, New York to the marital union of Eddy Jean and Marie Vincent in August, 1968. PSR ¶ 40. Defendant was primarily raised by her mother in New York in an average-income household and reported a "normal" childhood without abuse. *Id.* ¶ 41.

Defendant's parents divorced when she was an infant and her mother remarried. Defendant did not share a relationship with her stepfather, and her mother and stepfather eventually divorced. *Id.* Defendant told Probation her childhood "wasn't bad," but she also noted her father was not part of her life and her mother was not around as much as Defendant would have liked due to her work schedule. *Id.* ¶ 41

Defendant's father died in 1994 due to kidney failure. *Id.* ¶ 40. Defendant's mother is still alive and the two share a "good" relationship. *Id.* ¶ 41. However, her mother was unaware of the instant offense as of the writing of the PSR. *Id.*

Defendant has one maternal half-brother, with whom she shares a good relationship. *Id.* ¶ 40. Although, he, too, was unaware of the instant offense as of the writing of the PSR. *Id.* Defendant also has two paternal half-siblings. Defendant reports sharing a close relationship with her paternal half-sister, who is aware of the instant offense, is supportive of Defendant, and submitted a letter of support for Defendant. *Id.*; Ex. D to Def. Mem., ECF No. 116-1.

Defendant is presently engaged to Kenneth McClary. *Id.* ¶ 42. Defendant reports the two have a "very good" relationship and her fiancé is aware of the instant offense and supportive of Defendant. *Id.* Defense counsel clarifies in one of their PSR objections that while this characterization is mostly accurate, Mr. McClary's professional and financial successes stress Mr. McClary's relationship with Defendant; Defendant experiences feelings of inferiority and the need to prove herself to him, and their relationship dynamic reinforces Defendant's lifelong insecurities. Def. Mem. at 2. The Government notes that it has no information regarding this relationship dynamic, but posits its irrelevancy to Defendant's sentencing. Gov't Mem. at 5. The PSR as amended accepts and reflects defense counsel's objection. PSR Addendum at 3.

.

8

Prior to her relationship with Mr. McClary, from 1989 to 2010, Defendant was married to Khoeler Yves Depestre. PSR ¶ 43. Defendant reports her marriage to Mr. Depestre was "good" and that the two share one child together. *Id.* However, Defendant also claims the two eventually separated because they "married young." *Id.* Although they did separate, Defendant and Mr. Depestre never officially divorced. *Id.* Mr. Depestre tragically drowned approximately eight years prior to the PSR's writing. *Id.*

### 2.    Educational and Employment History

From 1983 to 1987, Defendant attended and received her high school diploma from Bishop Ford High School in Brooklyn, New York. *Id.* ¶ 52. Defendant went on to pursue numerous degrees of higher education. She attended American Public University (online) from 2014 to 2019. *Id.* ¶ 51. She received a Bachelor of Arts degree in marketing in 2017 and her first Master of Business Administration ("MBA") degree in 2020. *Id.* She more recently received an additional MBA degree in marketing from Columbia Southern University (online) in 2021. *Id.* ¶ 50.

In the early 2000s, Defendant reportedly worked as a full-time spa director, owned and operated her own spa business, and a full-time assistant and bookkeeper. *Id.* ¶¶ 60-62. Between 2004 and 2013, Defendant was reportedly employed as a home ownership counselor at two different businesses. *Id.* ¶¶ 58-59. From reportedly 2012 through 2013, Defendant began working as a full-time marketing agent before resigning to start Canvas, the company involved in the instant offense. *Id.* ¶¶ 56-57. Thereafter, from 2013 through 2020, Defendant reportedly owned and operated Canvas and was self-employed as a full-time marketing agent until her arrest. *Id.* ¶ 56. From 2020 through the time of the PSR writing, Defendant was reportedly employed as a full-time marketing agent. *Id.* ¶ 54. Defense counsel submits that Defendant

began working as the business and development coordinator at Media Buying Agency in Atlanta in April 2022. Def. Mem. at 3. The Government takes no position on this objection and proposed amendment. Gov't Mem. at 5. The PSR as amended accepts and reflects defense counsel's objection. PSR Addendum at 3.

### 3. Prior Convictions

The original PSR reports that Defendant has no prior criminal convictions. PSR ¶¶ 33-38. However, the Government objected to the PSR's purported omission of Defendant's criminal history, noting that Defendant has two prior New York criminal convictions: (1) grand larceny in the third degree, to which Defendant pled guilty on April 30, 2003; and (2) misdemeanor falsifying business records in the second degree, to which Defendant pled guilty on April 21, 2009 and was sentenced to three years' probation on June 30, 2010. Gov't Mem. at 5. The PSR as amended reflects these two prior convictions, although the Addendum does not include information on the dates or methods of conviction. PSR Addendum at 1-2. The PSR Addendum notes that Defendant was convicted of grand larceny in the third degree after entering returns on another individual's Mastercard account for items that were never purchased. PSR Addendum at 1. These returns totaled $10,283.75. *Id.* The Addendum further notes that Defendant was convicted of falsifying business records in the second degree related to Defendant wiring her personal and business accounts approximately $460,000.00 in checks stolen and forged from her employer, some of which she used to purchase a BMW. *Id.* at 1-2. The Second Addendum to the Presentence Report confirms the Defendant's arrest and disposition for her 2010 falsifying business records in the second degree conviction, and amends the first addendum to the PSR to reflect this information. Second Addendum to the PSR, ECF No. 122 ("Second Addendum"). While the Government represents that "these convictions do not yield criminal

history points," Gov't Mem. at 6, Probation notes that the second conviction yields one (1) criminal history point. PSR Addendum at 1-2. However, all parties agree that Defendant's criminal history score establishes a criminal history category of I (1). *Id.* at 2; Def. Mem. at 4; *see* Gov't Mem. at 5-6.

### 4.     Physical and Mental Health

In the PSR, Defendant reported she was presently in good physical and mental health, noting that while she experienced certain medical issues in the past, she did not claim those issues persisted at that time. *Id.* ¶¶ 47-48. In defense counsel's objections to the PSR, he notes that Defendant suffers from chronic sciatica for which she attends physical therapy. Def. Mem. at 2. The Government responded that it had no information about Defendant's purported condition. Gov't Mem. at 5. Defense counsel notes that Defendant currently struggles with feeling lonely, regretful, and inadequate, and further notes that Defendant attempted suicide at the age of 20. Def. Mem. at 2-3. The Government responded indicating it "lacks information to take a position regarding [Defendant] Jean's history." Gov't Mem. at 5. The PSR as amended accepts and reflects defense counsel's objections regarding Defendant's physical and mental health. PSR Addendum at 3.

### 5.     Substance Abuse

Defendant reports no history of illicit drug use or substance abuse. PSR ¶ 49.

### 6.     Nature and Circumstances of the Offense

The Court's previous statements make clear the nature and circumstances surrounding the instant offense. *See supra* Section I.

### B.     The Need for the Sentence Imposed

The second 18 U.S.C. § 3553(a) factor instructs the Court to consider "the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2).

Altogether, Defendant and co-Defendant solicited hundreds of thousands of dollars in furtherance of their fraudulent conspiracy.  They did so by falsely stating the funds would be paid to the musicians in exchange for the musicians' performance at concerts.  In actuality, Defendant and co-Defendant failed to pay the musicians as promised and instead misappropriated those funds.  PSR ¶ 5.  This offensive conduct is serious.

## C.      The Kinds of Sentences Available

The third § 3553(a) factor requires the Court to detail "the kinds of sentences available" for Defendant.  18 U.S.C. § 3553(a)(3).

Defendant pled guilty to the sole count of an Indictment charging her with Wire Fraud Conspiracy, in violation of 18 U.S.C. §§ 1343 and 1349.  Defendant faces various penalties for committing this offense, including terms of imprisonment and supervised release in addition to fines and a special assessment.

Defendant faces a maximum term of imprisonment of twenty years and no minimum term of imprisonment.  18 U.S.C § 1343.  Defendant also faces a term of supervised release of not more than three years.  18 U.S.C. § 3583(b)(2).  Defendant is eligible for not less than one nor more than five years of probation, and, barring extraordinary circumstances, one of the following must be imposed as a condition of probation: fine, restitution, or community service.

18 U.S.C. §§ 3561(c)(1) and 3563(a)(2). In addition, Defendant faces a maximum fine of $250,000.00. 18 U.S.C. § 3571(b). However, as Probation notes, based on Defendant's financial profile, she appears unable to pay a fine. PSR ¶ 68.

The Court is also required to impose a mandatory special assessment of $100.00 per count, 18 U.S.C. § 3013, and restitution pursuant to 18 U.S.C. § 3663A. Moreover, Defendant is subject to the terms of the Amended Order of Forfeiture, which the Court entered on February 22, 2024. Amended Order of Forfeiture, ECF No. 125 (obligating Defendant to pay a forfeiture money judgment in the amount of $43,973.01 in addition to the $19,679.99 that was seized on or about January 8, 2020 from the Wells Fargo Bank account, with account number 6108803146, held in the name of "Canvas Media").[1]

### D. The Kinds of Sentence and the Sentencing Range Established for Defendant's Offenses

The fourth § 3553(a) factor requires the Court to discuss "the kinds of sentence and the sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines[.]" 18 U.S.C. § 3553(a)(4)(A).

The parties originally disagreed as to whether Defendant's criminal history score is zero or 1. However, at Defendant's sentencing hearing, all parties agreed that Defendant has a criminal history score of 1, which, according to the sentencing table in U.S.S.G. Chapter 5, Part

---

[1] Defense counsel objects to the PSR's characterization of the forfeiture money judgment, asserting that in the plea agreement, defendant consented to entry of a forfeiture money judgment of *not more than* $82,104.00 rather than to the exact amount of $82,104.00. Def. Mem. at 2; PSR ¶ 81. The Government does not object to defense counsel's proposed amendment, Gov. Mem. at 5, and the PSR as amended accepts and reflects this objection. PSR Addendum at 3.

13

A, establishes a criminal history category of I (1). PSR Addendum at 2; Def. Mem. at 4; *see* Gov't Mem. at 6.

The applicable Guideline for violations of 18 U.S.C. § 1349 is U.S.S.G. §2X1.1. Pursuant to U.S.S.G. §2X1.1(a), Defendant's base offense level is determined by referencing the Guideline for the substantive offense, plus any adjustments from that Guideline that can be established with reasonable certainty. U.S.S.G. §2B1.1 is the Guideline for wire fraud, the substantive offense here. Therefore, Defendant's base offense level is 7 pursuant to U.S.S.G. §§2X1.1(a) and 2B1.1(a)(1). All parties agree with this base level calculation. PSR ¶ 23; Def. Mem. at 4; Gov't Mem. at 6. However, the parties disagree as to Defendant's total offense level.

Probation argues that 10 levels are added to this figure pursuant to U.S.S.G. §2B1.1(b)(1)(F) since Defendant is accountable for a total intended loss amount of $250,000.00, which is more than $150,000.00 but not more than $250,000.00. This results in an adjusted offense level of 17. PSR ¶¶ 24, 28; *see id.* at ¶ 18. However, 2 levels are removed pursuant to U.S.S.G. §3E1.1(a) since Defendant has clearly demonstrated acceptance of responsibility for the offense. *Id.* ¶ 30. Moreover, Probation asserts this figure is reduced by an additional 1 level pursuant to U.S.S.G. §3E1.1(b) since the Government was timely notified of Defendant's intention to enter a plea of guilty. *Id.* ¶ 31. Notably, Probation does not apply the 2-level Zero-Point Offender reduction originally proposed by both defense counsel and the Government, noting that Defendant's 2010 conviction yielded 1 criminal history point. PSR Addendum at 4. Altogether, Probation calculates that these adjustments result in a total adjusted offense level of 14. PSR ¶ 32; *see also* PSR Addendum at 2. Based upon a total adjusted offense level of 14 and a criminal history category of I (1), the recommended Guideline range of imprisonment is between 15 months and 21 months. PSR ¶ 70.

Defendant agrees the most appropriate guideline for this 18 U.S.C. § 1349 offense is the substantive offense section for wire fraud, U.S.S.G. §2B1.1, which provides a base level of 7 for the offense of conviction. Def. Mem. at 3. However, Defendant objects to the loss value used in the PSR. *Id.* at 2.[2] The PSR notes an intended loss of $250,000.00; because this is more than $150,000.00 but not more than $250,000.00, this results in a 10-level enhancement pursuant to U.S.S.G. §2B1.1(b)(1)(F). PSR ¶ 24; *see also id.* ¶ 18. Defense counsel suggests a number of reasons that the actual loss amount of $100,000.00 be utilized, resulting in an 8-level increase. Def. Mem. at 2. First, defense counsel cites to Defendant's plea agreement, wherein the Government estimated a loss greater than $95,000.00 yielding an 8-level increase. *Id.* Second, defense counsel asserts that if the Defendant had received any funds over $100,000.00, those funds would have been transferred to the artist as a booking deposit or, if the booking fell through, would have been returned to the investors. *Id.* Finally, defense counsel notes that Defendant told her co-Defendant that the investors should not transfer any more money until she was sure that the artist was committed. *Id.*

Defense counsel argues the offense level is decreased by 2 levels because Defendant has clearly demonstrated acceptance of responsibility for the offense. *Id.* at 4. Notably, defense counsel's calculation does not include the 1-level deduction based on timely notification to the Government of Defendant's intention to enter a plea of guilty. *Id.*

Defense counsel originally argued that Defendant was eligible for a 2-level reduction under the 2023 Amendments to the Sentencing Guidelines. *See* U.S.S.G. §4C1.1. Under these

---

[2] The Application Notes to U.S.S.G. §2B1.1 provide, in relevant part, as follows regarding loss calculations: (1) the "[g]eneral [r]ule" that "loss is the greater of actual or intended loss[,] U.S.S.G. §2B1.1 cmt. n.3(A) (emphasis omitted); (2) "[a]ctual loss means the reasonably foreseeable pecuniary harm that resulted from the offense[,]" U.S.S.G. §2B1.1 cmt. n.3(A)(i) (internal quotation marks and emphasis omitted); and (3) "[i]ntended loss . . . means the pecuniary harm that defendant purposely sought to inflict[,]" U.S.S.G. §2B1.1 cmt. n.3(A)(ii) (internal quotation marks and emphasis omitted).

amendments, Defendants are eligible for a further 2-level offense level reduction for being "Zero-Point Offender[s]." *Id.* Defense counsel asserted in his papers that Defendant was a Zero-Point Offender under the Guidelines, and there should therefore be a 2-level reduction to Defendant's offense level. Def. Mem. at 3-4. Altogether, defense counsel's original calculations yielded a total offense level of 11. However, defense counsel acknowledged at Defendant's sentencing hearing that, in light of the PSR Addendum's amendments to Defendant's criminal history, Defendant has 1 criminal history point. As a result, Defendant does not qualify for the Zero Point Offender reduction, although defense counsel emphasized Defendant's near-qualification for this reduction. Based on his representations during Defendant's sentencing hearing, defense counsel's calculations yield a total offense level of 13.

The Government agrees with Probation's total adjusted offense level calculation. Addressing Defendant's objection to the PSR's intended loss calculation, the Government notes that "[co-Defendant] Scott and [Defendant] Jean repeatedly pressured Individual #1 and the undercover FBI agent to pay the 'full deposit,' i.e. at least $250,000, despite the fact that by the time the undercover FBI agent was introduced [co-Defendant] Scott and [Defendant] Jean had no reason to believe they would be able to secure any of the performers whom they had offered to Individual #1." Gov't Mem. at 5. The Government asserts not only that defense counsel's objection assumes "that [Defendant] Jean and [co-Defendant] Scott had any intention of actually paying any artists or returning any money to the investors," but also notes that during the telephone call with an individual purporting to be Mr. Timberlake's manager, the individual "attempted to secure a $800,000 - $1 million contract price for a Justin Timberlake concert." *Id.* As such, the Government asserts that "a $250,000 intended loss . . . is a conservative figure." *Id.*

The PSR as amended does not reflect Defendant's objection and proposed amendment to the loss amount. PSR Addendum at 3.

The Government, like defense counsel, originally asserted that Defendant qualifies for a 2-level reduction as a Zero-Point Offender under the 2023 Sentencing Guidelines, thereby bringing Defendant's original total adjusted offense level to 12. Gov't Mem. at 6. However, at Defendant's sentencing hearing, the Government acknowledged that Defendant does not qualify for this 2-level reduction. As such, based on its representations during Defendant's sentencing hearing, the Government calculates a total adjusted offense level of 14.

According to Probation and the Government's calculations, the Guidelines imprisonment range is 15 months to 21 months imprisonment. According to defense counsel's calculation, the Guidelines imprisonment range is between 12 months and 18 months imprisonment. The Court adopts the positions of Probation and the Government.

Probation recommends the Court impose a sentence of imprisonment of 1 year and 1 day to be followed by two years of supervised release with special conditions. Probation's Recommendation, ECF No. 46-1, at 1. This is in addition to restitution in the amount of $100,000.00 and the mandatory $100.00 special assessment. *Id.* Probation bases this recommendation on the following factors: the instant offense was the only conviction known to Probation at the time of the original PSR writing; the instant offense appears to have been motivated primarily by greed; and the actual loss was relatively small compared to the amount of loss that could have resulted had the contracts be paid in full. *Id.* at 2-3. Altogether, in Probation's view, the nature and characteristics of this offense and this defendant may make a below-Guidelines sentence appropriate. *Id.* at 3. Although, Probation still recommends a custodial sentence as warranted. *Id.*

Defense counsel, on the other hand, recommends the Court impose a non-custodial sentence of probation. Defense counsel bases this recommendation on the following factors: Defendant's good-faith intent and attempts to book the artists, notwithstanding the Defendants' misstatements regarding the status of those bookings; Defendant's ethical behavior and hard work throughout her career, which the instant conduct was antithetical to; Defendant's efforts to rebuild her life and career while on bail, along with her devotion to her fiancé and daughter; Defendant's commitment to restitution; and the prudence of avoiding unwarranted sentencing disparities. Def. Mem. at 1. While recognizing that Defendant and co-Defendant Scott made misrepresentations and mistakes, defense counsel insists that Defendant did not intend to defraud anyone and asserts that Defendant did, in fact, attempt to book the musicians, going so far as to contact agents, managers, attorneys, and producers affiliated with those artists. *Id.* at 5-6. Indeed, defense counsel spends pages of its memorandum detailing the efforts Defendant made to book artists for the concert, *id.* at 6-12, and explains that, as opposed to trying to cheat investors, Defendant took affirmative steps to make the bookings happen. *Id.* at 6. Moreover, defense counsel likens Defendant and co-Defendant Scott's communication to a game of "telephone" because Defendant was not in direct contact with the investors: Defendant sometimes overstated her progress in booking the artists, and then co-Defendant further exaggerated those statements to the investors and generally acted as an unreliable messenger. *Id.* at 6. Defense counsel asserts that Defendant has learned from and internalized the gravity of her mistakes, and is working to make up for her prior misconduct. *Id.* at 12.

Defense counsel reports that the now-55-year-old Defendant is gainfully employed and is working so hard that her Pretrial Services Officer recommended that Defendant take time for herself and work less. *Id.* at 13. Defense counsel asserts that incarceration is not needed to

effectuate specific or general deterrence, and requests that the Court sentence Defendant to a non-custodial sentence such as home confinement with allowances for work and necessary appointments. *Id.* Such a sentence, in defense counsel's view, would allow Defendant to continue to work and fulfill her restitution obligations. *Id.* at 12-13. Defense counsel further posits that home detention as a condition of probation would allow the Court to effectuate a more punitive sentence, if the Court felt such a sentence necessary. *Id.* at 14. Further, defense counsel notes that a sentence of probation would avoid any unwarranted sentencing disparities between the two defendants in this case, as co-Defendant Scott received a sentence of two years of probation. *Id.* at 13-14.

Defense counsel leans on two provisions of the Sentencing Guidelines in support of a downward departure from a Guidelines sentence. First, defense counsel quotes a recent amendment to the Sentencing Guidelines, which provides "[a] departure, including a departure to a sentence other than a sentence of imprisonment, may be appropriate if the defendant received an adjustment under §4C1.1 (Adjustment for Certain Zero-Point Offenders) and the defendant's applicable guideline range overstates the gravity of the offense because the offense of conviction is not a crime of violence or an otherwise serious offense." *Id.* at 4 (quoting U.S.S.G. §5C1.1 cmt. n.10(B) (internal quotation marks omitted). Defense counsel acknowledged at Defendant's sentencing hearing that Defendant is ineligible for the Zero-Point Offender reduction, but in light of Defendant's near-qualification for the reduction, urged the Court to consider the spirit of this Guidelines provision as grounds for a downward departure in its § 3553(a) analysis. Second, defense counsel cites U.S.S.G. §5C1.1, subsection (c)(3) of which provides "[i]f the applicable guideline range is in Zone B of the Sentencing Table"—which is where Defendant's offense level fell under defense counsel's original calculations—"the minimum term may be satisfied

19

by[] . . . a sentence of probation that includes a condition or combination of conditions that substitute intermittent confinement, community confinement, or home detention for imprisonment according to the schedule in subsection (e)." *See* Def. Mem. at 4. This Court has also read and considered the letters written by Defendant's loved ones, family, and current boss. Exhibits A-E of Def. Mem., ECF No. 116-1; ECF No. 123-1. These letters talk about Defendant as a loving mother and maternal figure, a person of integrity and ethics, and a hard-working entrepreneur and employee. *Id.* In his letter, Defendant's boss stated that he would contribute to Defendant's restitution payments, which Defendant agreed to pay back through commission and bonuses. ECF No. 123-1. The Court appreciates what Defendant's advocates have said on her behalf.

The Government originally recommended a Guidelines sentence of 10 months to 16 months incarceration. Gov't Mem. at 7. However, at Defendant's sentencing hearing, the Government noted that it would be appropriate for the Court to consider the 12 to 18 months Guidelines imprisonment range contemplated by the plea agreement when crafting its sentence. The Government points to Defendant and co-Defendant's "brazen fraud[]" against a victim who "was planning a benefit event for a charity founded by the families of child victims of a historic mass shooting" in support of this recommendation. *Id.* Further, the Government notes that Defendant "falsely represented the nature of her relationships and her communications with artists to [co-Defendant] Scott, knowing that this would be conveyed to Individual #1[]" and, despite Defendant's representations that she made efforts to secure the artists, Defendant "substantially overstated her ability to book these acts and used those lies to attempt to solicit more and more funds from Individual #1 and the undercover agent." *Id.*

The Government rejects defense counsel's representation that Defendant had "good faith intention[s]" to book the musicians. *Id.* at 2. The Government asserts that "the record of correspondence between [Defendant] Jean and [co-Defendant] Scott shows that [Defendant] Jean overstated her ability to secure performers like Justin Timberlake to [co-Defendant] Scott, knowing that [co-Defendant] Scott would, in turn, supply that information to the fraud victim[,]" citing three examples of communications where Defendant "repeatedly sent text messages to [co-Defendant] Scott claiming to have communicated with various artists' managers[,]" when in the eyes of the Government "the evidence reflects she had no relationship with any legitimate management for these artists." *Id.* The Government further notes it was Defendant who provided the fraudulent contract purporting to be signed by Mr. Timberlake's representative to secure Mr. Timberlake's performance. *Id.* at 3. Additionally, Defendant, after receiving the $100,000.00 deposit, made "payments to Saks Fifth Avenue and nearly $9,000 in cash withdrawals." *Id.* at 3. The Government also notes that defense counsel omits references to Defendant's role in having an individual call Individual #1 and falsely claiming to be Mr. Timberlake's manager, asserting that "[Defendant] Jean and [co-Defendant] Scott were both participants in the scheme to arrange this false phone call" and providing text messages to that effect. *Id.* at 3-4.

This Court appreciates the sentencing arguments raised by all parties and has considered each of these arguments in turn.

### E.  Pertinent Policy Statement(s) of the Sentencing Commission

The fifth § 3553(a) factor requires the Court to evaluate "any pertinent policy statement . . . issued by the Sentencing Commission." 18 U.S.C. § 3553(a)(5).

The parties have not drawn the Court's attention to any applicable policy statements. Finding none on its own, the Court proceeds to the next § 3553(a) factor.

### F.    The Need to Avoid Unwarranted Sentence Disparities

The sixth § 3553(a) factor requires this Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

The Court has premised its sentence around the nature and characteristics of this Defendant and of the instant crime of conviction. The Court has carefully considered the sentencing options written into the statute and recommended by the Guidelines. In doing so, the Court has ensured the sentence it now imposes will avoid unwarranted sentence disparities.

### G.    The Need to Provide Restitution

Lastly, the seventh 18 U.S.C. § 3553(a) factor requires the Court to touch upon "the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a)(7).

Pursuant to 18 U.S.C. § 3663A, restitution in the total amount of $100,000.00 shall be ordered in this case. *See also* PSR ¶¶ 79-80 (U.S.S.G. §5E1.1 also provides restitution is mandatory in this case).

## IV.    CONCLUSION

For the reasons set forth above, the Court determines a sentence of 15 months of imprisonment, 2 year(s) of supervised release with special conditions, forfeiture in accordance with the Amended Order of Forfeiture, restitution, and a $100.00 mandatory special assessment is consistent with, and is sufficient but no greater than necessary to accomplish, the purposes of § 3553(a)(2). The Court does not impose a fine because Defendant appears unable to pay a fine.

22

The Court expressly adopts the factual findings of the Presentence Investigation Report, and the addenda thereto, barring any errors contained therein, to the extent they are not inconsistent with this opinion.

SO ORDERED,

S/ WFK

HON. WILLIAM F. KUNTZ, II
UNITED STATES DISTRICT JUDGE

Dated: February 22, 2024
        Brooklyn, New York

23